In re Thomas Vinson **BLANTON, Jr., Debtor.**

**Thomas Vinson BLANTON, Jr., Plaintiff,**

v.

**PRUDENTIAL–BACHE SECURITIES, INC., James E. Trice, Defendants.**

**Bankruptcy No. 88–0059–RT, Adv. No. 88–0083–RT.**

United States Bankruptcy Court, E.D. Virginia, Richmond Division.

May 30, 1989.

---

H. Slayton Dabney, McGuire, Woods, Battle & Boothe, Richmond, Va., for plaintiff/debtor.

John S. Barr, Kevin R. Huennekens, Maloney, Yeatts & Barr, Richmond, Va., for defendants.

## OPINION

DOUGLAS O. TICE, Jr., Bankruptcy Judge.

This litigation came before . the Court upon the debtor's amended complaint seeking damages from the defendants on the basis of eight alleged counts or causes of

action. A ninth count was withdrawn by the debtor as provided by order of the Court entered August 19, 1988. At the request of the parties, the Court held trial on the following six counts with the remaining two counts to be considered subsequently:

Count I     Turnover of $1,226,161.98 and $11,923.00
Count II    $1,350,000.00 preference
Count III   $1,605,440.00 preference
Count IV    Breach of contract—deferred compensation account
Count V     Duress
Count VIII  Breach of fiduciary duty

In adversary proceedings that are to be tried before a bankruptcy judge, a complaint or counterclaim must contain a statement that the proceeding is core or noncore. *See* Bankr.R. 7008(a). In responding to a complaint or counterclaim in an adversary proceeding the responsive pleading must admit or deny the allegation that the proceeding is core or noncore and include a statement that the party does or does not consent to the entry of a final order or judgment by a bankruptcy judge. *See* Bankr.R. 7012(b).

Here Blanton's amended complaint contained an allegation that the proceedings were core proceedings. Prudential–Bache's amended answer to this allegation stated that the allegation was a legal conclusion that does not require a response under the Federal Rules of Civil Procedure and that to the extent an answer was required the allegation was denied. Prudential–Bache's response did not comply with the pleading requirements of Bankruptcy Rule 7012(b).

This Court observes that Prudential–Bache raised only two jurisdictional issues in this adversary proceeding: (1) the Court's jurisdiction to hear Count IV of the amended complaint and (2) the affirmative defense that the issues raised by this adversary proceeding are referable to arbitration under rules of the New York Stock Exchange. By order entered on September 13, 1988, this Court overruled the first jurisdictional contest. As to the second jurisdictional attack, although the defendants raised the issue of arbitration as an affirmative defense, the defendants did not pursue or legally explain this defense at trial or in argument. Since neither party further contested this Court's jurisdiction to hear any portion of the amended complaint, this Court will accept jurisdiction and hear the entire matter.

### Summary of Decision

Facts. Plaintiff Blanton, while employed as a stock broker for defendant Prudential–Bache, traded for his own account and for clients in foreign currency options. Large sums were involved in these investments which were carried on margin financed by Prudential–Bache. From the currency investments Blanton earned substantial income, much of which was retained by Prudential–Bache under a deferred compensation plan it maintained for employees. In January 1987 a fall in the value of the U.S. dollar against Swiss francs resulted in Prudential–Bache's liquidation of Blanton's option positions in this currency at a substantial margin account deficit. The liquidation expenditures necessary to repurchase Blanton's option positions were only partly covered by funds withdrawn by Blanton from his deferred compensation account. Blanton remains indebted to Prudential–Bache in a sum in excess of $1,933,000.00. He has a present balance remaining with Prudential–Bache in his deferred compensation and another account in excess of $1,220,-000.00.

Held: Count I, Turnover—Setoff. Blanton is not entitled to turnover from Prudential–Bache under § 542(b) of the balance of his deferred compensation account because Prudential–Bache has a superior right to offset the account against Blanton's indebtedness under § 553.

Counts II, III; Preference. Blanton may not recover, as preferential transfers under § 547(b), the two transfers of deferred earnings to Prudential–Bache used to finance liquidation of his currency investments. The payments were margin or settlement payments excepted by § 546(e) from preference avoidance.

Counts IV, VIII; Breach of Contract, Breach of Fiduciary Duty. Prudential–Bache breached its contract with Blanton under the deferred compensation contract and also breached a fiduciary duty to Blanton by its failure to withhold sufficient Federal income withholding taxes from the deferred earnings withdrawals. Additional sums as determined by the Court must be remitted by Prudential–Bache to the Internal Revenue Service as Blanton's damages.

Count V, Duress. There was no legal duress in Prudential–Bache's requiring Blanton to withdraw deferred earnings to cover his margin losses as a condition to continued employment and under threat of lawsuit.

## Findings of Fact

Defendant James E. Trice is a Senior Vice President of defendant Prudential–Bache Securities, Inc. (Prudential–Bache), where he has been employed since 1963. He has had extensive management experience with Prudential–Bache and since March 1986 has served as regional manager for the company's southeastern region, which includes the Richmond and Lynchburg offices in Virginia. As regional manager, Trice has management supervisory responsibilities over all branch offices located in the southeastern region.

The debtor, Thomas Vinson Blanton, Jr., was employed as a securities account executive (commonly referred to as a stock broker) with Prudential–Bache in its Richmond, Virginia, branch office from May 1984 until his resignation on July 16, 1987. Blanton is married and has three children. He holds a college degree in business administration.

Blanton joined Prudential–Bache after having worked as a securities broker since the 1970's for other, smaller firms. He brought with him to Prudential–Bache one major client, a wealthy physician who was interested in various types of trading in foreign currencies. Blanton had changed brokerage firms because he believed Prudential–Bache's size and international reputation presented much better opportunity for the types of investments in which he and his principal client were interested.

At Prudential–Bache, Blanton's predominant activity involved foreign currency trading. His was a highly sophisticated and complex investment practice, much of which required extensive and time consuming mathematical calculations. Blanton was essentially a workaholic, spending long days in his office and often working late at home.

A major type of trading engaged in by Blanton for approximately ten clients and also for his own account involved his sale of options for the purchase and sale (straddles) of foreign currency, including Swiss francs. It was this trading which contributed so much to Blanton's initial success with Prudential–Bache and which led to his bankruptcy and the instant litigation.

Trading in currency options was done on an options exchange located in Philadelphia. In its fundamental form this type of trading was described by Blanton as follows:

Well, the basic strategy in just a very broad sense is, you have the Swiss francs at a spot rate in U.S. cents of, we will use an arbitrary number of 65 cents, which means one Swiss franc is equal to 65 cents. The strategy was that we would sell [a] call which is whereby you [give] the right for someone to call the Swiss franc away from you at a specific strike price for a specific period of time and you would sell the call above the 65 cents. For argument's sake we will use it, we each sell it at a specific period of time. You have given someone the right to call away Swiss francs from you at 70 cents U.S. terminology. For that right they paid you a premium. Simultaneously you would sell a put which gave someone the right to put that Swiss franc to you at a specific price for a period of time.

Well, say that we used the strike price of 60, you would also try to keep a band around it so at the spot of 65, you would sell a 70 call and 60 put, and from that you would receive a premium which premium you would invest in treasury bills.

The records of these complex transactions were maintained by Prudential–Bache on an extensive system of computer records.

As explained by Blanton, he and his clients typically sold option straddles (both puts and calls) for Swiss francs. These types of investments were in highly leveraged blocks and involved large sums of money. At least in hindsight, currency options trading was also highly speculative in presenting potential for huge gains or losses. That substantial sums were involved is demonstrated as follows: One option contract gave the purchaser a right to purchase (call) or to sell (put) 62,500 Swiss francs. At one time, Blanton was obligated on 2,000 Swiss franc straddles, that is, 2,000 calls and 2,000 puts. At an assumed price of 65 cents per franc, the total investment would approximate $80,000,000.00 (62,500 francs times $.65 times 2,000).

Through 1986, Blanton's commission and bonus income from Prudential–Bache were approximately as follows:

| | |
|---|---|
| 1984 | $ 350,000.00 |
| 1985 | $ 650,000.00 |
| 1986 | $3,500,000.00 |

As a result of his success as an account executive, Blanton received a number of letters from senior officials of Prudential–Bache recognizing and commending his outstanding performance. In February 1985, Blanton was notified that company management had appointed him a vice president-investments in recognition of his ability and contributions; in 1986 he was appointed senior vice president-investments. Because of his high commissions Blanton was made a member of Prudential–Bache's "Millionaires Club". In January of 1986 and 1987 he was appointed a member of the Chairman's Council, a group limited to the top ninety producers among qualified Prudential–Bache account executives for the preceding years.

The conferring of the titles vice president-investments and senior vice president-investments was provided for in the Prudential–Bache corporate by-laws under a section dealing with the election of officers of the corporation by the board of directors. This section provided in part as follows:

\* \* \* \* \* \*

The Chairman of the Board may confer on specified employees titles and limited powers as divisional officers (and terminate at any time any title so conferred) including the title of

\* \* \* \* \* \*

Senior Vice President–Investments, Vice President–Investments,

\* \* \* \* \* \*

but such persons shall not be authorized to exercise the powers of officers of the Corporation.

Company policy provided for the conferring of these two titles on account executives who had at least three years experience and whose production reached certain stated levels.

During each of the years Blanton was employed by Prudential–Bache, the company provided a deferred compensation plan which permitted employees who had earned over $50,000.00 in the preceding year to defer a portion of income. The purpose of such a plan is to enable employees to defer income (and income tax) to a more advantageous future year.

Blanton was eligible and elected to participate in Prudential–Bache's deferred compensation plan in each of the years 1984 through 1987. Identical plan agreement forms were used each year which provided that an employee could defer all or any portion of income in excess of $50,-000.00 per year. Compensation deferred by employees was not set aside as a separate fund; rather, deferred amounts represented an unsecured obligation of the company. Moreover, this obligation was specifically stated in the plan to be subordinated to payment of Prudential–Bache's general creditors in the event of the company's bankruptcy or liquidation. A "Master Subordination Agreement" attached as part of each annual plan described in detail the subordinate status of the employee's claim to payment of compensation deferred.

The deferred compensation plan agreement form provided for administration by a

committee appointed by Prudential–Bache's executive committee. However, as late as January 1987 no deferred compensation plan committee had ever been designated. Instead the plans were administered and management decisions made by the senior management of Prudential–Bache.

Each deferred compensation plan in which Blanton participated contained the following paragraph relating to the deferred account of the employee:

### Non–Assignability

A Participant's interest in the Account may not be assigned, pledged, transferred, alienated or otherwise disposed of, or subjected to garnishment, bankruptcy proceeding, transfer by operation of law, or legal process.

On December 31, 1986, Blanton's deferred compensation account reflected the following balances of income deferred:

| | |
|---|---|
| Plan Year 1986 | $3,274,447.02 |
| Plan Year 1985 | $ 476,138.94 |
| Total Account | $3,750.582.96 |

For plan year 1987, the following commissions earned by Blanton were credited to his deferred compensation account:

| | |
|---|---|
| January 1, 1987 | $223,504.07 |
| January 31, 1987 | $508,505.89 |
| February 28, 1987 | $189,175.99 |
| February 28, 1987 | $ 12,003.51 |
| March 31, 1987 | $ 5,612.51 |
| April 30, 1987 | $ 19,491.34 |
| Total Deferred | $958,293.31 |

On December 7, 1987, Blanton borrowed the sum of $900,000.00 from Prudential–Bache for which he executed a promissory note, unsecured in form. The loan with interest at 9 percent was due on January 31, 1988, and has not been repaid.

During the period prior to January 1987, both Blanton and his clients had made substantial investments in Swiss franc currency option straddles. These largely leveraged investments were financed by margin accounts with Prudential–Bache advancing credit in accordance with appropriate stock exchange margin requirements. Blanton maintained a cash management account with Prudential–Bache which he used for various purposes, including maintaining any margin requirements. This account, known as a command account, was similar to a bank account but could also receive as it did for Blanton other types of investments such as stocks and treasury bills.

The events which resulted in Blanton's problems began in approximately mid-January 1987 when the U.S. dollar began to fall in relation to the Swiss franc in such a significant way as to create a highly volatile market in the options trading engaged in by Blanton and his clients. With the fall of the U.S. dollar, the value of Blanton's and his clients' currency option investments began to decline which led Prudential–Bache to issue calls to investors to put up additional collateral or margin for their leveraged investments. Because of the substantial amounts these investments represented, the margin calls also became substantial.

At about the same time as the upheaval began in the Swiss franc trading market, Prudential–Bache experienced problems with its computer records of currency transactions and holdings. Although the specific computer problems are not revealed by the record, some examples included the placing of currency option positions in the wrong accounts, unpriced trades or positions and the dropping of positions. These problems with the computer records added confusion to the problem created by the volatility of the market and raised questions as to the accuracy of Prudential–Bache's margin calls.

There had been occasions of fluctuations in the value of the dollar prior to January 1987 which affected investments in Swiss franc options. On these prior occasions Blanton had been able to move his and his clients' positions in franc options in line with shifting dollar values. He did this by employing a technique known as "rolling" or "moving out of the way". He described this technique at trial as follows:

I explained about a band and the band was 70 and 60 and the spot price was in the middle of 65. Now, in the circumstances where everybody seemed to have gotten hurt so badly, the Swiss franc

went way up so we used that so let's say the dollar is extremely weak at the spot price, the Swiss franc is moving up and it is moving up to 70 cents, so you are at a place where you could be subject to being called away Swiss franc which I had no Swiss francs to deliver. Neither did anybody else and we did not plan on it. At that point what you would do is you would repurchase your 70 call. You would repurchase your [60] put and now move your band up to maybe a 75 call, and a 65 put. In other words, maintaining your band, but at the same time just kind of move adjusting your position away from where the spot was to stay out of the way kind of.

Included in Prudential–Bache's margin calls for currency option positions during the week of January 19, 1987, were large amounts directed to Blanton for his personal holdings. Blanton hoped to be able to roll his own positions as he had done before and avoid having to completely liquidate his option straddles. Since rolling these positions required additional investment in addition to meeting margin calls, Blanton hoped to raise the capital necessary to maintain his already substantial investment. His first effort to raise money after the January margin calls began was a request to Prudential–Bache to lend him $1,000,000.00. On about January 23, 1987, Blanton received a telephone call from Trice, his regional manager, who told him that Prudential–Bache could not make the requested loan because the company had a policy against lending an employee in excess of $1,000,000.00, and Blanton already had a loan of $900,000.00. Trice informed Blanton that his only alternative was to take funds from deferred compensation. This telephone call marked the first time Blanton had spoken to Trice since March 1986, just after Trice became southeastern regional manager, and was also Blanton's first notice of Trice's involvement in the growing problem with Swiss franc investments.

Following his talk with Trice on January 23, Blanton prepared and sent a memorandum to Robert Blinder, a Prudential–Bache Senior Vice President in New York, which stated in part as follows:

Due to unforeseen and unanticipated financial requirements, I must withdraw $2,000,000 from my deferred compensation plan.

During the week of January 19, 1987, Trice learned that Prudential–Bache had issued margin calls to Swiss franc currency options investors in the Richmond and Lynchburg offices and that some investors had not met their calls. The outstanding calls grew from an amount initially reported of approximately $1,000,000.00 to approximately $4,000,000.00 by week's end. Trice scheduled a meeting in Richmond to deal with what he considered a potentially major problem for the company.

On Sunday, January 25, 1987, Trice and an assistant met in the Richmond office of Prudential–Bache with branch manager Richard Sugarman and Blanton. At the beginning of the meeting, Trice became upset when he learned of the very large amounts of the investment positions of Prudential–Bache clients in currency options, which he considered to be completely out of proportion to most of the investors' net worths. He also learned there was the possibility that some of the clients might not meet substantial margin calls. Trice harshly accused Sugarman of withholding information during the preceding week. In an angry tirade, Trice paced around the meeting room, called Sugarman a liar and generally berated him. At one point, Trice slammed his open hand down hard on a desk and so startled Blanton that Blanton left the room. Trice reminded Blanton that his remarks were directed at Sugarman not Blanton.

After the initial flareup, the meeting settled down to a discussion of particular clients' margin situations. Also, during the afternoon Blanton discussed his own situation with Trice and told him he had requested the $2,000,000.00 withdrawal from deferred compensation which he hoped to receive early that week.

A crisis atmosphere continued in the Richmond office during the week of January 26, and Trice remained in Richmond.

Also on January 26, Blanton's request to withdraw $2,000,000.00 from his deferred compensation account was received by the company in New York and approved. A Prudential–Bache check in the amount of $1,788,655.80 made payable to Blanton was sent which he received on January 27. On this same date Blanton deposited the check in his account in Signet Bank, and from these funds he drew and delivered a check to Prudential–Bache in the amount of $1,350,000.00; the purpose of this payment was to meet Blanton's margin calls.

As late as January 27, Blanton still hoped to be able to roll and save his positions as well as those of his clients who could afford to stay in the currency market. On the evening of January 27, a meeting was held in Potomac, Maryland, between Blanton's principal client and representatives of Prudential–Bache, including Trice and Sugarman. Blanton had planned to attend but cancelled for personal and family reasons related to the pressure he had been under in his work. At this meeting, representatives of the brokerage firm advised Blanton's client to begin liquidating his investments in Swiss franc options.

The next day, Wednesday, January 28, Blanton learned of the recommendation for his client to liquidate currency options when he spoke to the client by telephone; initially he advised his client against this strategy, but Trice overheard Blanton's side of the conversation and ordered Blanton to comply with the client's request to effectively close his options accounts as was desired by Prudential–Bache.

On this same day, Prudential–Bache began to liquidate Blanton's franc option positions, against his wishes. Blanton pled with Trice to allow him to stay in and attempt to preserve his positions. Blanton argued that he could attempt to borrow funds and also that he still had money in his deferred compensation account. Trice attempted to persuade Blanton that he should get out of the currency investments while he could and not be wiped out in the falling market. Later in the day as market conditions had worsened, Trice came to Blanton's office and advised him there was still the problem of a margin shortage in his account and that it would be necessary for Blanton to take the remaining funds out of deferred compensation to cover his losses. In a threatening manner Trice said to Blanton that if he refused, "I will see to it that you are fired." In addition Trice told Blanton that he would be sued by Prudential–Bache. When Blanton hesitated and suggested that he wanted to telephone a friend with Prudential–Bache, an attorney who had also traded in Swiss francs, Trice replied that this same attorney would be sueing Blanton.

Beginning with the margin calls the previous week and continuing up to this time, Blanton had been under a great deal of mental pressure. Blanton was concerned not only with the loss of his own investment positions but also with the losses faced by his clients, many of whom were close friends. He believed that Trice could and would carry out his threats to have him fired and sued by the company; following this exchange with Trice, Blanton agreed to withdraw additional funds from his deferred compensation account for the necessary margin payment.

Blanton and Trice then discussed how the withdrawal was to be accomplished. Blanton agreed that he would withdraw all sums to his credit in the deferred compensation account except for an amount sufficient to cover his $900,000.00 note held by Prudential–Bache. Since Blanton expressed uncertainty about how to accomplish the withdrawal, Trice dictated the following memorandum which Blanton wrote by hand:

28 Jan '87

I would like to withdraw all remaining funds [in] deferred compensation except for $900,000.00 which will collateralize the loan that I had borrowed from Prudential–Bache previously.

This letter will authorize you to make the check payable to Prudential–Bache & deposit to my account # RF–870256–2–15.

Sincerely—
T. Blanton

Trice took the memorandum and sent it to Prudential–Bache's New York office which on February 6, 1987, wire transferred the sum of $1,436,868.00 to Blanton's command account. The journal entry on Prudential–Bache's books, also made on February 6, treated the transfer of funds as a salary advance to Blanton's margin or command account. The entry reflecting the transfer of funds from Blanton's deferred compensation account was not made on Prudential–Bache's records until April 1987. The firm's records reveal that for the pay period April 1987 a withdrawal was made from Blanton's deferred compensation in the total amount of $1,605,440.21; of this sum, $1,436,868.98 was credited against the salary advance posted on February 6, and the difference was entered as Federal and state income withholding taxes.

Beginning on January 28 and continuing for at least several days, Prudential–Bache representatives other than Blanton caused orders to be placed on the Philadelphia options exchange which ultimately resulted in liquidation of a number of Swiss franc options held by investors in the Richmond and Lynchburg offices. Blanton had little, if any, control over the disposition of his or his clients' currency options after January 27, 1987. Blanton's last currency options were closed out on February 10, 1987 (see schedule below), and by the end of March all of the personal holdings in his command account were liquidated.

The following schedule represents Prudential–Bache's margin calls to Blanton's command account at the close of the dates shown:

| | | |
|---|---|---|
| Thursday | January 22, 1987 | $ 643,361.00 |
| Friday | January 23, 1987 | $ 958,869.00 |
| Tuesday | January 27, 1987 | $ 440,583.00 |
| Wednesday | January 28, 1987 | $1,847,861.00 |
| Friday | January 30, 1987 | $1,317,311.00 |

Blanton was given credit for his $1,350,-000.00 check to Prudential–Bache on January 27, and the margin call shown above for this date reflects this payment. No record is available which reflects the amount of Blanton's margin call at closing on Monday, January 26, 1987.

1. Figures (rounded) are approximate.

The following schedule reflects a summary of the expenditures and receipts in Blanton's command or margin account for the period January 28, 1987, through February 10, 1987, the date upon which his Swiss franc positions were fully liquidated.

| | |
|---|---|
| Expenditures for purchase of calls and puts | $8,203,681.00 |
| Receipts from sale or liquidation of investments (excludes payments from Blanton) | (3,225,639.00) |
| Net Expenditures | $4,978,042.00[1] |

The expenditures for the purchase of currency option calls and puts were necessary to the liquidation of the currency investments.

After February 10, 1987, all other investments Blanton held in his command account were liquidated. Blanton's command or margin account reflected the following ending cash balances on the dates shown:

| | |
|---|---|
| January 28, 1987 | $1,658,562.88 credit balance |
| February 6, 1987 (includes receipt of $1,436,869.98 wire transfer) | $ 862,625.51 credit balance |
| February 9, 1987 | $ 506,367.35 credit balance |
| February 10, 1987 | $ 700,116.16 deficit |
| March 25, 1987 (date upon which all investments liquidated) | $ 532,686.33 deficit |

As a result of the losses from the liquidation of his command account investments and a loan by Prudential–Bache to Blanton for increased withholding taxes which is described below, Blanton has a present deficit in his command account in the amount of $1,033,100.00. This sum represents an unsecured indebtedness of Blanton to his former employer.

By letter dated July 16, 1987, Blanton notified Prudential–Bache of his resignation from the company.

On December 31, 1987, Prudential–Bache's books reflected a balance in Blanton's deferred compensation account in the amount of $1,210,665.76 and a 1985 partnership bonus plan deferred account in the

amount of $10,517.00. These sums plus interest subsequently accrued remain on Prudential–Bache's books as credits in favor of Blanton.

## Income Tax Withholding From Deferred Compensation Account Withdrawals

Blanton's two withdrawals from his deferred compensation account caused him to realize taxable income in 1987 on the sums withdrawn. He will also realize income when the remaining deferred earnings held by Prudential–Bache are withdrawn. The only payments made on Blanton's 1987 income tax are those withheld and paid by his employer Prudential–Bache.

Each deferred compensation plan agreement in which Blanton participated contained the following paragraph relating to the payment of deferred amounts to the employee:

> All payments pursuant to this Plan should be reduced by the amount of applicable federal, state, and local withholding taxes.

On September 26, 1985, Blanton prepared an Internal Revenue Service (IRS) Form W–4, Employee's Withholding Allowance Certificate, which he submitted to Prudential–Bache and which instructed the company to withhold 20 percent of his income for Federal taxes. This W–4 form was still in effect in January 1987.

At the time Blanton requested the $2,000,000.00 withdrawal from his deferred compensation account on January 23, 1987, he advised Prudential–Bache through Sugarman, his branch manager, that he wanted 8.5 percent withheld for Federal taxes. As a result of this request, from the $2,000,000.00 withdrawal Prudential–Bache withheld $170,000.00 for Federal withholding tax, $40,000.00 state tax withholding and $1,344.20 FICA tax. Blanton received a net check in the amount of $1,788,655.80.

When Blanton requested the second withdrawal of deferred compensation by his memorandum of January 28, 1987, the question of tax withholding was not raised with him. As previously determined by the Court, Prudential–Bache in response to this memorandum transferred $1,436,868.98 of

its funds on February 6, 1987, to Blanton's command account and on the books charged this sum as a salary advance to Blanton. Prudential–Bache did not enter this transaction in its payroll records until April 1987. At that time entries were made in the firm's books to reflect the withdrawal of $1,605,440.21 from Blanton's deferred compensation account, the crediting of $1,436,868.98 against the previous salary advance entry and tax withholding of $136,462.43 (8.5 percent), Federal, and $32,108.80 (2 percent), state. These amounts withheld for taxes were remitted to the taxing authorities after May 1, 1987.

Beginning in late January 1987 and continuing in February and March, Prudential–Bache attorneys were involved in various legal matters arising out of the liquidation of the currency options. Blanton met with the company's attorneys to assist them in dealing with litigation which was anticipated and in which Blanton personally as well as Prudential–Bache might become party.

Not until after February 1, did it occur to Blanton that the amount of taxes withheld from his deferred compensation withdrawals was too low to pay his ultimate Federal and state income tax liabilities on these large sums of income which he had realized in 1987. Also, Blanton became concerned that he should have his own independent counsel since it had become apparent to him that his interests did not always coincide with the interests of Prudential–Bache. On March 1, 1987, he contacted and retained counsel at the law firm which is representing him in his present bankruptcy case and this adversary proceeding.

On March 17, 1987, Blanton prepared and submitted to Prudential–Bache a new IRS W–4 form directing his employer to withhold 40 percent Federal tax and 6 percent state.

After negotiations between Blanton's counsel and Prudential–Bache, the company agreed to increase the tax withholding by the amounts of $328,371.44, Federal, and $163,485.80, state. These amounts were remitted to the taxing authorities, and the total sum of $491,857.24 was

charged (debited) to Blanton's command account as a loan from Prudential–Bache to Blanton.

### Discussion and Conclusions of Law

Because of the complexity of the facts and issues here, the Court has made detailed findings of fact. However, for discussion purposes the salient facts may be summarized.

Blanton, the chapter 11 debtor and plaintiff, brought this adversary proceeding against his former employer, Prudential–Bache, and Trice, an executive of the brokerage company. As a broker in Prudential–Bache's Richmond office, Blanton had specialized in investments in foreign currency, including the sale of options to buy and sell Swiss francs (straddles). Through his firm, Blanton brokered these investments for his own account and for approximately ten clients. Tremendous dollar amounts were involved which were largely carried on margin financed by Prudential–Bache.

From his employment in 1984 until January 1987 Blanton had been quite successful; his earned commissions for the year 1986 were approximately $3,500,000.00. Because of his substantial earnings, by January 1987 Blanton had accumulated under annual deferred compensation plans maintained by Prudential–Bache an amount in excess of $4,000,000.00.

During the second half of January 1987 the U.S. dollar fell in relation to the Swiss franc, creating a volatile market in Blanton's and his clients' option straddle positions. Because of the dollar decline, Prudential–Bache began to issue margin calls requiring investors in the Richmond office, including Blanton, to put up additional collateral to cover their leveraged investments. The margin calls in some instances ran to hundreds of thousands of dollars or more.

Blanton hoped to avoid liquidation of his investments by "rolling" his option positions, i.e., disposing of positions and then reacquiring new positions in line with the market. Initially, he received permission from Prudential–Bache to withdraw $2,000,000.00 from his deferred compensation account so that he might meet his margin calls; from this withdrawal Blanton paid Prudential–Bache $1,350,000.00 on January 27, 1987. On the next day, as the dollar continued its decline, Blanton was confronted by his regional manager Trice who was in Richmond to deal with the crisis. After Trice was unable to persuade Blanton to get out of the volatile market, he advised Blanton that he must withdraw the balance of his deferred compensation in order to meet continuing margin calls. Otherwise, Trice threatened he would see to it that Prudential–Bache fired Blanton and also sued him for any shortage in his margin account.

In the face of Trice's demands, Blanton consented to request Prudential–Bache to use the balance in his deferred compensation account to apply to his margin calls (except for an amount sufficient to cover a $900,000.00 loan the company had made to Blanton previously). In response to Blanton's request for this withdrawal, Prudential–Bache transferred $1,436,868.98 to his margin (command) account on February 6, 1987.

Beginning at about this same time, Prudential–Bache management decided without Blanton's consent to liquidate his option positions along with those of a number of his clients. Approximately two weeks later, after Blanton's investment account was liquidated, he was left with a deficit owed to the company in excess of $500,-000.00. A subsequent controversy between Blanton and Prudential–Bache over the appropriate amount of taxes that should have withheld from the deferred compensation withdrawals resulted in the firm's lending Blanton additional sums which it paid to the taxing authorities.

As the matter now stands, Blanton has an indebtedness to Prudential–Bache in the amount of $1,933,100.00 (exclusive of accrued interest). To his credit on the Prudential–Bache books, Blanton's deferred compensation account and another account show a balance in the total amount of $1,221,182.76 (exclusive of accrued interest).

The issues raised by the plaintiff's six causes of action are:

1. (a) Whether pursuant to § 542(b) of the Bankruptcy Code Blanton is entitled to turnover from Prudential–Bache of the $1,221,182.76 balance in his deferred compensation account; conversely,

(b) Whether pursuant to § 553 of the Bankruptcy Code Prudential–Bache may offset the deferred compensation balance against the $1,933,100.00 indebtedness of Blanton.

2. Whether Blanton's $1,350,000.00 payment to Prudential–Bache on January 27, 1987, constituted an avoidable preference under § 547(b) of the Bankruptcy Code.

3. Whether Blanton's $1,436,868.98 payment to Prudential–Bache on February 6, 1987, constituted an avoidable preference under § 547(b) of the Bankruptcy Code.

4. Whether Blanton has a claim for damages against Prudential–Bache for the company's under withholding of Federal and state income taxes in the withdrawals from Blanton's deferred compensation account.

5. Whether Blanton has a claim for damages against the defendants for duress based upon Trice's threats which caused Blanton to make the second withdrawal from deferred compensation.

6. Whether Blanton has a claim for damages against the defendants based upon a breach by Prudential–Bache of a fiduciary duty to him.

Although Blanton's allegations of Prudential–Bache's breach of fiduciary duty in Count VIII of the amended complaint are rather broad, Blanton has submitted no evidence nor made any argument on brief that raises an issue of breach of fiduciary duty except with respect to Count IV, breach of contract. Therefore, except as to Count IV, the Court has not considered the allegations of breach of fiduciary duty as an issue to be resolved.[2]

Blanton's two major concerns in this chapter 11 case are the income tax debt generated by the large withdrawals of deferred income in 1987 and his indebtedness to Prudential–Bache. In filing this adversary proceeding he effectively launched a counter attack against these two creditors. Most of the issues raised by Blanton's complaint are essentially common law questions, and Blanton's position on these issues is not enhanced by his bankruptcy filing. (The only causes of action here which arise solely under the Bankruptcy Code are the preference allegations in Counts II and III of the complaint.)

The Court is at somewhat of a disadvantage in this proceeding. First, the parties for reasons of their own elected to withhold from trial the issues raised in Counts VI and VII which concern whether Prudential–Bache wrongfully or negligently liquidated Blanton's Swiss franc options. Second, there is the spector of IRS and its unknown position on Blanton's tax debt. Though originally named as a defendant, IRS elected to remove itself from this proceeding and was dismissed as a party. And while the evidence supports the conclusion that Blanton will have substantial income tax liabilities because of his realizing deferred earnings, the amount of his ultimate tax liability has not been established.[3]

The evidence which would have been generated by the Court's consideration of these matters, particularly in a full airing of the liquidation issue, could have been invaluable to the Court's resolution of some of the issues decided in this opinion.

---

**2.** However, in the section of Blanton's brief dealing with turnover-setoff, it is argued that as a result of Prudential–Bache's exercise of control over Blanton and his deferred earnings, the company assumed a fiduciary duty to deal fairly with Blanton's creditors and that at a later time Blanton may request the Court to subordinate Prudential–Bache's claim to claims of other creditors. *Plaintiff's Post–Trial Memorandum* at 18–19 n. 9.

**3.** On brief, Blanton's counsel states that the 1987 unpaid income tax liability will be approximately $753,260.60. Blanton testified at trial his 1987 tax liability would be about $800,000.00 and his overall tax liability $1,100,000.00. These figures must be speculative because Blanton's tax returns are subject to audit by IRS, whose views are unknown. *Plaintiff's Post–Trial Memorandum* at 20. Transcript of Proceedings, Sept. 13, 1988, at 285.

## Count I Turnover (Setoff)

Blanton asks for an order of turnover by Prudential–Bache under Section 542(b) of the balance in his deferred compensation account and a bonus plan account in the respective amounts of $1,210,665.76 and $10,517.00 plus accrued interest.

Blanton's deferred compensation balance is not represented by a separate cash fund but is an unsecured obligation of Prudential–Bache which by terms of the plan is subordinated to claims of the company's general creditors. The annual plan agreements provide that upon the termination of a participant's employment the company is to pay to the participant the balance in the account. This payment provision is subject to approval by the New York Stock Exchange and is also subject to the employee's annual elections as to the period of deferral. Since these latter provisions appear to have been primarily for an employee's benefit (assuming Prudential–Bache's financial resources meet stock exchange requirements), the Court concludes from evidence in the record that under ordinary circumstances, the balance in Blanton's deferred account would have been paid over to him upon his request at termination of employment. There being no evidence to the contrary, the Court reaches the same conclusion with respect to the smaller bonus account.

Section 542(b) of the Bankruptcy Code provides in part that

> an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

11 U.S.C. § 542(b) (1982).

Prudential–Bache raises several defenses to Blanton's turnover request.

The principal defense to the turnover is Prudential–Bache's claim to setoff under

§ 553 of the Bankruptcy Code. The offset claim is made in Paragraph 9 of affirmative defenses contained on page 14 of the defendants' answer to the amended complaint. However, Prudential–Bache has not formally requested relief from the automatic stay imposed against setoff claims by Code Section 362(a)(7).[4]

The defense of setoff is the predominant and overriding issue under Count I since § 542(b) plainly states that to the extent allowed a setoff will prevail over a turnover. Section 553(a) provides that with certain exceptions the filing of a bankruptcy petition does not

> affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case.

11 U.S.C. § 553(a) (1982 & Supp. V 1988).

In Section 553, the Bankruptcy Code does not create a substantive right but merely preserves in limited form the common law right of offset or setoff. In the simplest form of setoff, parties each having an unrelated and prepetition indebtedness to the other may offset their respective debts so that only a net difference, if any, remains owing. Many reported decisions have considered setoff under Section 553 and its predecessor, Section 68(a) of the Bankruptcy Act; fairly specific principles have been established to apply to individual cases.

Setoff is an equitable remedy which although generally favored is not automatic or self-executing but which must be timely asserted by the creditor. *Cumberland Glass Mfg. Co. v. DeWitt*, 237 U.S. 447, 35 S.Ct. 636, 59 L.Ed. 1042 (1915); *Melamed v. Lake County Nat'l Bank*, 727 F.2d 1399, 1404 (6th Cir.1984); *New Jersey Nat'l Bank v. Gutterman (In re Applied Logic Corp.)*, 576 F.2d 952, 957 (2d Cir.1978).

A creditor claiming setoff must show that the prepetition obligations be-

---

**4.** The Court notes that Prudential–Bache's proof of claim filed in Blanton's bankruptcy case states the claim is not subject to any setoff or counterclaim; however, the claim asserts that it

is secured by Blanton's deferred compensation account and subordinated compensation account.

tween the creditor and the debtor are mutual, meaning simply that the debts are between the same parties, standing in the same capacities. *Tradex, Inc. v. U.S. (In re IML Freight, Inc.)*, 65 B.R. 788, 793 (Bankr.D.Utah 1986); *see* 4 L. King, *Collier On Bankruptcy*, ¶ 553.04 (15th ed. 1989). Strictly speaking, setoff applies where the opposing claims arise from different transactions. The doctrine of recoupment, which some courts have held is subject to different treatment in bankruptcy, applies where the claims arise from the same transaction. *See Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir.1984).

As stated above, § 553 does not create a federal right of setoff but preserves existing rights of setoff under Federal or State law. *In re Wilde*, 85 B.R. 147, 149 (Bankr. D.N.M.1988); *In re Rinehart*, 76 B.R. 746, 749 (Bankr.D.S.D.1987). Setoff issues in bankruptcy are therefore usually determined under the law of the state where the operative facts took place. *In re Britton*, 83 B.R. 914, 918 (Bankr.E.D.N.C.1988); *Williams v. American Bank of the Mid–Cities, N.A. (In re Williams)*, 61 B.R. 567, 571 (Bankr.N.D.Tex.1986).

Prudential–Bache's deferred compensation plans provide that they are to be construed under New York law. The parties here have made no contention as to the applicability of New York or Virginia law in the issues which arise under the plans, and in fact the Court has been unable to discern any significant difference between New York and Virginia setoff law which might affect the ruling to be made on Count I.

Applying these setoff principles to the Blanton—Prudential–Bache scenario, since the claims in question are prepetition mutual debts between the parties, it appears on first impression that Prudential–Bache has a good claim to offset Blanton's deferred compensation and bonus account balances against his indebtedness to it.

Blanton's Argument that Prudential–Bache's Deferred Compensation Plan Prohibits Setoff Against Blanton's Deferred Funds.

■ Blanton's primary argument against Prudential–Bache's assertion of setoff of his deferred account balance is based upon the nonassignability provision contained in each deferred compensation agreement which states that a plan participant's interest in the account

> may not be assigned, pledged, transferred, alienated or otherwise disposed of, or subjected to garnishment, bankruptcy proceeding, *transfer by operation of law*, or legal process. (emphasis supplied)

It is argued in particular that the prohibition of a "transfer" of Blanton's plan interest "by operation of law", prohibits a claim of setoff by Prudential–Bache. (There appears to be no similar language applicable to Blanton's bonus plan account of $10,517.00.)

It is beyond question that the type of nonassignability or nonalienation language that appears in deferred compensation agreements as well as in individual retirement accounts and qualified pension or profit sharing plans may be broadly stated to be for the purpose of deferring a participant's income tax. There is nothing in the present record that suggests Prudential–Bache's plan form was intended to take a position one way or the other on the company's right to setoff. Except for the present dispute there would be no purpose in Prudential–Bache's withholding the funds from Blanton upon his request for payment. Of course, he is subject to income tax upon the withdrawal, but of this he is fully aware and has directed Prudential–Bache to withhold taxes.

Thus at the outset the Court must interpret language which was apparently not intended to deal with setoff although it may vaguely support Blanton's argument; moreover the provision no longer serves its original purpose since Blanton wishes to withdraw the funds.

As an abstract proposition, it does not appear that courts have interpreted the phrase, "by operation of law", to support Blanton's argument. This is illustrated in the *Black's Law Dictionary* definition quoted in Blanton's counsel's brief:

Operation of law. This term expresses the manner in which rights, and sometimes liabilities, devolve upon a person by the mere application to the particular transaction of the established rules ·of law, *without the act or co-operation of the party himself.*

*Black's Law Dictionary* 985 (5th ed.1979) (emphasis added). The few cases which have considered the phrase have applied it to instances not where a party undertakes to directly assert a legal right but where legal consequences flow from another transaction. An example is a corporate dissolution which results in the transfer by operation of law of title in corporate property to the stockholders. *See Historic Smithville Dev. Co. v. Chelsea Title & Guar. Co.,* 184 N.J.Super. 282, 445 A.2d 1174, 1180 (N.J.Super.Ct.Ch.Div.1981); *Terminals & Trans. Corp. v. State,* 169 Misc. 703, 704, 8 N.Y.S.2d 282, 284 (N.Y.Ct.Cl. 1938); *Klauber v. San Diego St. Car Co.,* 95 Cal. 353, 358, 30 P. 555, 556 (1892). On the other hand, when a creditor asserts its legal or equitable right of setoff, this is a direct act of the party. Even though a rule of law is involved, the setoff is accomplished not by operation of law but by this act.

Nevertheless, the important argument raised by Blanton on this question should not be determined by arcane rules of construction which might be overcome by other more persuasive indications of intent or controlling legal authorities.

Blanton's counsel also argues that the breadth of the definition of "transfer" in Section 101(50) of the Bankruptcy Code establishes that setoff is a transfer for bankruptcy purposes and accordingly that the term as used in the Prudential–Bache

plan effectively prohibits setoff. However, see *Eckles v. Petco, Inc., Interstate (In re Balducci Oil Co., Inc.),* 33 B.R. 847, 852 (Bankr.D.Colo.1983), in which the court held that under the 1978 Bankruptcy Code a setoff is not a transfer. This holding is not particularly relevant to our case because what the court in *Balducci* meant was that a setoff does not constitute a transfer for purposes of Section 547 of the Code.[5]

Parties to transactions may by agreement preclude setoff between them. *See* 80 *C.J.S. Set–Off And Counterclaim* § 14 (1953); 20 *Am.Jur.2d Counterclaim, Recoupment, and Setoff,* § 29 (1965); Annotation, *Contractual Waiver of Right of Setoff or Counterclaim,* 98 A.L.R. 602–07 (1935); *Armour & Co. v. Whitney & Kemmerer, Inc.,* 164 Va. 12, 178 S.E. 889, 98 A.L.R. 596 (1935); *Silbert v. Silbert,* 85 A.D.2d 661, 445 N.Y.S.2d 215 (1981). Courts will enforce contract provisions waiving setoff rights. Although some cases state that setoff waiver provisions may be express or implied, it has also been held that waiver cannot be inferred from equivocal language nor deduced from ambiguous expressions. *Armour & Co.,* 164 Va. at 24, 178 S.E. at 893, 98 A.L.R. at 602 (citing 57 C.J., page 376, Section 23).

Akin to the waiver cases, another line of authority has involved setoff claimed against a special purpose account held for the debtor by a creditor. Bankruptcy setoff has generally been denied to the holder of a debtor's individual retirement account (IRA) ˙or other special purpose account on the basis that the creditor holds the account as a trustee and therefore the requisite mutuality between the parties is lack-

---

**5.** Setoff has been part of the bankruptcy law since 1800. Although it was desired to retain the concept in the 1978 Bankruptcy Code, Congress recognized that in the bankruptcy context setoff often defeats a debtor's reorganization efforts because the creditor with a right of setoff receives preferential treatment over other creditors. Although the 1978 Code as originally passed by the House of Representatives contained the transfer definition with setoff included, the Senate version which was ultimately adopted by Congress deleted setoff from the definition. In the 1978 Bankruptcy Code, Con-

gress dealt with setoff not under the preferential transfer provisions of Section 547 but in a separate Section 553 which included restrictions on setoff not contained in Section 68(a) of the Bankruptcy Act. Since setoff was not treated as a preferential transfer, it was removed from the Code definition of transfer. *See* Senate Debate on the Compromise Bill, 124 Cong.Rec. S17403–34 (daily ed. October 6, 1978); *In re Prescott,* 805 F.2d 719, 730 (7th Cir.1986); *Eckles v. Petco, Inc., Interstate (In re Balducci Oil Co., Inc.),* 33 B.R. 847, 852 (Bankr.D.Colo.1983).

ing. *See Texas Mortgage Services Corp. v. Guadalupe Savings & Loan Ass'n (In re Texas Mortgage Services Corp.),* 761 F.2d 1068 (5th Cir.1985); *In re Mastroeni,* 57 B.R. 191 (Bankr.S.D.N.Y.1986); *First State Bank of Monahans, Texas v. Holt (In re McDaniel),* 41 B.R. 132 (Bankr.W.D.Tex. 1984); *Bank of Dixie v. Gentry (In re Todd),* 37 B.R. 836 (Bankr.W.D.La.1984). See also *Wiley v. Public Investors Life Ins. Co.* 498 F.2d 101 (5th Cir.1974), where based on an employment contract the debtor's employer prevailed over the trustee in bankruptcy and was allowed to offset its claim against future commissions to be earned by the debtor.

Although the waiver and special account cases generally support Blanton's argument that the right of setoff may be abrogated, the Court has been unable to find any factually similar case which conclusively supports either side of the argument.

From the decisions already cited by the Court, *In re Mastroeni* is perhaps the most supportive of Blanton's position. *Mastroeni* involved a bank's claim of setoff against the debtor's IRA account. The court based its decision to deny the bank's claimed setoff both on the trust relationship of the bank to the fund and also on the terms of the custodial agreement between the bank and the debtor. This agreement provided that the IRA funds were not to be used for purposes other than the exclusive benefit of the debtor-depositor and that funds were not subject to "legal or equitable process, except by the custodian for its fees and other expenses ... except to the extent required by law." *In re Mastroeni,* 57 B.R. at 194. In substance the bankruptcy court held that under the IRA agreement the bank had relinquished its right of setoff.

In urging its right of setoff here, Prudential–Bache cites *Virginia v. Haley (In re Haley),* 41 B.R. 44 (Bankr.W.D.Va.1984), in which the State of Virginia was allowed to offset its claim against the retirement fund of a former state employee. The stat-ute creating the retirement system provided that an individual's benefits under the pension system were not subject to "execution, attachment, garnishment or any other process whatsoever". Va.Code Ann. § 51–111.15 (1988). The bankruptcy court reasoned that since the debtor had terminated her state employment and under the statute was entitled to recover her retirement contributions, the restrictions against process were no longer applicable. Therefore, an offset by the State for an indebtedness incurred by the debtor while she was employed by the State was appropriate.[6]

Although *Haley* involved a dischargeability complaint, the basic facts of the case rather strongly support Prudential–Bache's position. It can be said that once Blanton terminated his employment, he also could request a refund of his deferred account, and the restrictions on process or transfer had lost any real meaning.

In conclusion, the Court finds that the Prudential–Bache plan form restrictions on alienation or prohibition of transfer by operation of law are not sufficiently precise to preclude the company's right of setoff in Blanton's deferred compensation account. Moreover, even if the contractual language could be construed to apply to setoff, any prohibition was removed upon Blanton's resignation of his employment. *In re Haley,* 41 B.R. at 44.

### Blanton's Argument that Setoff Is a Permissive Right Which the Court Should Deny.

Blanton argues in the alternative that if Prudential–Bache has not contractually abrogated its right of setoff, the Court may and should in its discretion deny the company's claim of setoff. Many cases state the general rule, relied upon by Blanton, that setoff is a permissive right rather than mandatory, and the exercise of setoff is within the discretion of the bankruptcy court under general principles of equity. *Cumberland Glass Mfg. Co.,* 237 U.S. at 455, 35 S.Ct. at 639, 59 L.Ed. at 1042; *Melamed,* 727 F.2d at 1404; *Federal De-*

---

**6.** Following the *Haley* decision, the Virginia legislature in 1986 amended Va.Code § 51–111.15 to specifically provide that the exemption from process of retirement funds did not apply to "a debt to any agency which has employed such person".

posit Ins. Corp. v. Bank of America Nat'l Trust and Savings Ass'n, 701 F.2d 831, 836 (9th Cir.1983); *Big Bear Super Market No. 3 v. Princess Baking Corp. (In re Princess Baking Corp.)*, 5 B.R. 587, 589 (Bankr.S.D.Calif.1980); 4 L. King, *Collier on Bankruptcy*, ¶ 553.02 (15th ed.1989).

Although the court may exercise discretion, setoff is a favored remedy, based upon notions of fairness, and is not to be denied merely because it would provide an unjust result. *New Jersey Nat'l Bank v. Gutterman (In re Applied Logic Corp.)*, 576 F.2d 952, 957 (2d Cir.1978). In fact, setoff must be allowed unless its "allowance would not be consistent with the provisions of the Bankruptcy Act as whole." *Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1165 (2d Cir.1979); *Tradex Inc.*, 65 B.R. at 792.

The bankruptcy cases in which courts have exercised discretion to block a setoff may be divided into two general categories.

In one class of cases, the creditor is denied the immediate right of setoff, but the setoff claim is treated as a secured claim as provided by Bankruptcy Code Section 506(a). This situation usually arises in chapter 11 cases where the right of setoff is acknowledged, but the debtor needs the funds owed by the creditor in order to have any chance at a successful reorganization. The creditor's setoff rights are thus deferred but preserved. *Braniff Airways Inc. v. Exxon Co. U.S.A.*, 814 F.2d 1030, 1034 (5th Cir.1987); *In re Rinehart*, 76 B.R. at 749; *Sandoz v. Conoco, Inc. (In re Delta Energy Resources, Inc.)*, 67 B.R. 8 (Bankr.W.D.La.1986); *cf. Niagara Mohawk Power Corp. v. Utica Floor Maintenance Inc. (In re Utica Floor Maintenance Inc.)*, 41 B.R. 941 (N.D.N.Y.1984). As a secured creditor, the setoff claimant may be entitled to relief from the stay and proceed to setoff if the debtor cannot provide adequate protection. *In re Chestnut Co., Inc.*, 39 B.R. 519 (Bankr.D.S.C.1984); *Massachusetts v. Dartmouth House Nursing Home, Inc., (In re Dartmouth House Nursing Home, Inc.)*, 24 B.R. 256 (Bankr. D.Mass.1982).

A second class of cases denies all right of setoff to a creditor either on grounds of public policy or because the creditor committed an inequitable, illegal or fraudulent act.

Under unique circumstances, claims of setoff against debtors' bank deposits have been denied to the banks on public policy grounds. *See Federal Deposit Insurance Corp. v. Bank of America*, 701 F.2d 831 (9th Cir.1983); *Kruger v. Wells Fargo Bank*, 11 Cal.3d 352, 521 P.2d 441, 113 Cal.Rptr. 449 (1974). Also, in *Tucson House Construction Co. v. Fulford*, 378 F.2d 734 (9th Cir.1967), a claim of setoff under Section 68 of the Bankruptcy Act was denied as "grossly inequitable" where the creditor had purchased several claims of others against the debtor for the specific purpose of claiming the setoff. (The acquisition of setoff claims prior to bankruptcy was specifically dealt with in Section 553(a)(2) of the 1978 Bankruptcy Code. 11 U.S.C. Section 553(a)(2).)

Most cases in which courts have exercised discretion to deny setoff outright have involved creditors who engaged in illegal or fraudulent conduct. These include:

(1) Claims arising from creditor's violation of Truth–in–Lending Act. *Riggs v. Gov't Employees Fin. Corp.*, 623 F.2d 68 (9th Cir.1980); *Newton v. Beneficial Fin. Co. of New Orleans*, 558 F.2d 731 (5th Cir.1977).

(2) Claim under Federal usury law. *McCollum v. Hamilton Nat'l Bank of Chattanooga*, 303 U.S. 245, 58 S.Ct. 568, 82 L.Ed. 819 (1938).

(3) Claim against creditor for conversion of debtor's assets. *Windsor Communications Group, Inc. v. Havertown Printing Co. (In re Windsor Communications Group, Inc.)* 79 B.R. 210 (E.D. Pa.1987); Annotation, *Right to Setoff Tort Claims and Contract Claims Against One Another Under § 68(a) of the Bankruptcy Act*, 34 A.L.R. Fed. 579, 590–95 (1977).

(4) Claims against creditor for conversion, misrepresentation, deceit, breach of fiduciary duty; and for unauthorized,

fraudulent and preferential transfers. *Browner v. Rosen,* 56 B.R. 214 (D.Mass. 1985).

(5) Creditor's claim based upon an illegal (criminal) agreement. *Palmer v. Doull Miller Co., Inc.,* 233 F. 309 (S.D.N.Y. 1916).

(6) Claims against creditors who received fraudulent transfers. *Bennett v. Rodman & English, Inc.,* 2 F.Supp. 355 (E.D.N.Y.1932); *Irving Trust Co. v. Frimitt,* 1 F.Supp. 16 (S.D.N.Y.1932); *Hassett v. Weissman (In re O.P.M. Leasing Services, Inc.),* 35 B.R. 854 (Bankr.S. D.N.Y.1983).

(7) Claim against creditor based upon breach of fiduciary duty. *Palmer v. Stokely,* 259 F.Supp. 776 (W.D.Okla. 1966).

In all of these cases, the courts have looked to the nature of the competing claims. In denying the creditors' setoff courts have generally held as a technical matter there was an absence of the mutuality of claims required for setoff under Section 553(a). *See Hassett v. Weissman,* 35 B.R. at 868. In these cases it is often pointed out that to allow setoff in light of the creditors' conduct would perpetuate wrongful acts.

In the brief of Blanton's counsel, extensive argument is made that Blanton's treatment at the hands of Trice, particularly on January 28, 1987, constituted such inequitable or wrongful conduct by Prudential–Bache as to warrant the Court's denial of the company's claim of offset. This is probably the only remedy that will help Blanton's reorganization case because it seems unlikely that he can provide adequate protection if Prudential–Bache's setoff is deferred but treated as a secured claim.

As previously determined factually by the Court, on January 28, after several days of crisis in Swiss franc trading, Trice confronted Blanton and told him in a threatening manner that Blanton must withdraw the balance in his deferred compensation account to cover his losses; otherwise Blanton would be fired and Prudential–Bache would sue him. Blanton testified he was dissuaded by Trice from calling

a friend at Prudential–Bache who was an attorney and also traded in Swiss francs; however, the Court gives no significant weight to Blanton's suggestion that Trice prevented him from consulting an attorney with regard to the payment demand. It is not clear from Blanton's testimony that he wanted to consult this person as an attorney or that Trice wrongfully prevented the contact. Trice simply maintained his hard line position that Blanton should agree to the payment.

Blanton's compliance with Trice's insistence of payment is at the heart not only of Blanton's contention that the Court should exercise discretion to deny setoff but also Blanton's allegations of damages for duress in Count V.

The Court has essentially accepted Blanton's version of the disputed events of January 28. In addition to Blanton's testimony based upon his direct experience with Trice, the Court bases its determination of what likely transpired between Trice and Blanton on evidence given by Blanton's witnesses, Richard Sugarman and Kell Gay, both of whom gave convincing testimony of their first hand experiences with Trice during this same period of time. Their testimony illustrates how harshly Trice could deal with subordinates. However, the Court rejects any suggestion of the testimony that Trice physically coerced Blanton to make the payment. The Court's findings on these circumstances are supported by clear and convincing evidence.

Having made these findings, however, it must be said in Trice's defense that at that time and from out of nowhere he was handed an extremely difficult situation which ultimately cost his company substantial losses. There is no persuasive evidence before the Court that Prudential–Bache management's handling of its clients' Swiss franc straddle options in January 1987 was improper. While the Court cannot condone Trice's abusive management style, he had extensive supervisory experience, and the Court finds it difficult to overly fault him for using all his powers of persuasion to control the damage caused by the volatile franc market. Moreover, Blanton by his

extensive dealings in a highly speculative commodity must accept at least some share of the responsibility. If the evidence demonstrated that Prudential–Bache improperly dealt with the market crisis, the Court might take a different view.

The circumstances of this case are unlike those in the cases where setoff was denied on equitable grounds. As pointed out previously, in those cases the courts were confronted with claims either by or against creditors which arose from the creditor's wrongdoing. The competing claims were not mutual. Here, the parties are agreed that the respective claims involved ·in the turnover and setoff allegations are in themselves valid and owing by each party. Thus, these opposing claims are mutual.

Blanton's opposition to setoff is based upon Trice's conduct with respect to Blanton's agreement to withdraw deferred funds. These particular funds are the subject of another claim by Blanton in his duress allegations. The Court has been unable to find a reasonably analagous case where setoff between mutual claims was denied because of unrelated wrongful conduct by the creditor.

In *Browner v. Rosen,* 56 B.R. 214 (D.Mass.1985), the debtor's trustee in bankruptcy filed a multicount complaint against a creditor who responded by asserting a counterclaim and setoff for debts owed him by the debtor. Even though the creditor, who was the former president of the debtor, appeared to have committed several serious offenses, the court allowed him to offset against the trustee's counts of damages for breach of contract, money had and received and money lent. The court denied setoff only as to those counts of the complaint seeking damages for the creditor's alleged wrongful acts, such as conversion, misrepresentation and breach of fiduciary duty. The court held there was the requisite mutuality of claims for the former counts but not as to the latter. *Browner,* 56 B.R. at 217–18.

This Court finds a relevance between the instant case and the holding in *Browner.* Although it must be acknowledged that there might be circumstances where a creditor's conduct should block setoff of mutual claims, the Court is not convinced that Trice's conduct was so egregious as to warrant denial of Prudential–Bache's claim of setoff as between the competing mutual claims here. Blanton's remedy in this case, if any, must lie elsewhere.

Therefore, the Court declines to exercise its discretion to deny Prudential–Bache's right of setoff. As mentioned above, Prudential–Bache has not formally sought relief from the stay under § 362 to exercise its setoff. However, since the Court has considered all issues relating to the setoff, no purpose would be served by requiring Prudential–Bache to file a separate motion for relief from the stay. At the same time, there is the remote possibility that Blanton may wish to offer adequate protection so that he might have use of the funds. Therefore, the Court will provide in its judgment order issued concurrently with this opinion that the stay of § 362 is lifted as to Prudential–Bache's exercise of its setoff right unless with ten days after entry of the order, Blanton files with the Court a request to offer adequate protection. If such a request is timely filed, the stay will remain in effect pending further order of the Court.

In view of the Court's ruling that Prudential–Bache has a right to setoff its claims against Blanton's deferred compensation, other arguments of Prudential–Bache against setoff are made moot. Nevertheless, the Court makes the following rulings as to these arguments: (1) Prudential–Bache has no security interest in Blanton's deferred compensation account other than that which follows from its right of setoff. (2) Blanton's letter of January 28, 1987, which was dictated by Trice, did not serve to modify the deferred compensation agreement so as to permit Prudential–Bache to apply $900,000.00 of the deferred account to Blanton's note; the meaning of the letter in this respect is too ambiguous to support Prudential–Bache's position.

One final point must be covered with respect to setoff. The Court agrees with Blanton's position that when Prudential–Bache takes funds from Blanton's de-

ferred compensation account, even by way of setoff, the effect will be a distribution of taxable income to Blanton. Accordingly, "applicable" Federal and state employment taxes must be withheld and paid by Prudential–Bache to the appropriate authorities. The Court's views on the appropriate amount of income taxes to be withheld are expressed in another section of this opinion.

### Count V Duress

In Count V of his amended complaint Blanton alleges:

53. The threats made by Prudential–Bache and Trice against Blanton caused Blanton to take action he was under no legal obligation to take, including the execution of Exhibit B hereto.

Exhibit B is a copy of Blanton's handwritten note of January 28, 1987, dictated by Trice and directing Prudential–Bache to withdraw all remaining funds in the deferred compensation account except for $900,000.00. Blanton alleges as his damages the loss of $1,605,440.00 taken from the account at this direction. (This figure represents the gross withdrawal; the sum of $1,436,868.98 was applied to Blanton's command account on February 6, 1987, with the balance later paid as withholding tax to taxing authorities.)

In his duress allegations, Blanton relies upon the same basic operative facts as were previously discussed by the Court in connection with setoff. Trice threatened that unless Blanton agreed to withdraw deferred earnings to pay toward his margin debt to Prudential–Bache, Blanton would be fired by Prudential–Bache and also sued for his indebtedness to the company. In consideration of the elements of duress, some further analysis of these facts is necessary.

It is not clear from the evidence what Blanton's realistic alternatives were on January 28. He testified that he did not want to liquidate his franc option straddles but rather preferred to maintain the investments by the technique known as "rolling". In spite of Blanton's optimistic testimony that given the opportunity he believed he could have preserved his positions, there is no evidence by which the Court might conclude this was a realistic possibility. Just a week previously, Blanton had recognized the necessity to put up additional margin when, after being unable to borrow funds, he requested and received permission to withdraw $2,000,000.00 from deferred earnings and from this paid $1,350,000.00 to his command account for margin. Why Blanton took a different approach to his financial dilemma on January 28 is not satisfactorily explained. Presumably he wanted to use his remaining capital to preserve his investments. But the amount necessary to accomplish this is unknown. Moreover, under the deferred compensation agreement it is quite unlikely that he could have forced Prudential–Bache to allow him to withdraw deferred funds for this purpose.

A critical factor to all of this is that Prudential–Bache cannot be held responsible for the crisis confronting Blanton. He was the force behind the investments which were losing value, and Prudential–Bache was required by stock exchange regulation to maintain minimum margin in its customers' investment accounts.

From the standpoint of Trice and Prudential–Bache, they were confronted by Blanton who, to their dismay, wished to maintain his leveraged positions in a falling market and invest more money to the company's possible detriment. Prudential–Bache, it may be assumed, was not without some knowledge of how to deal with the franc options market. The evidence has not established that Prudential–Bache's actions caused Blanton's ultimate losses in the investments, and the company's decision to insist that Blanton get out of the market and cover his losses may well have been a prudent and conservative business decision. Moreover, as suggested above, the company had no contractual obligation to release deferred funds to Blanton to use for additional investments.

The issue then is whether the Prudential–Bache's insistence on margin payment, accompanied by Trice's threats to sue Blanton and fire him, will, under the law of duress, allow Blanton to rescind his permis-

sion to withdraw the deferred funds and require repayment from the company.

Since all of the events relating to duress took place in Virginia, the Court's decision on this issue will be based upon Virginia law. Blanton has the burden of proof to establish duress, which in Virginia has been held subject to a clear and convincing standard of evidence.[7]

The concept of duress as a remedy to revoke a prior legal transaction is found in the common law. Even under the modern law, courts are reluctant to restructure previously struck bargains. This reluctance is better understood in light of the early duress cases in which courts recognized the remedy only where a courageous person was threatened with imprisonment or the loss of life or limb; a threat of physical battery alone was not sufficient because, it was reasoned, the law provided a remedy for battery, but the law could not restore life or a limb. 13 W. Jaeger, *Williston On Contracts* § 1601, at 648–49 (3d ed. 1970); 25 *Am.Jur.2d Duress and Undue Influence*, § 11, at 367 (1966); Wertheimer, *Coercion* at 23 (Princeton University Press, 1987); *Ford v. Engleman*, 118 Va. 89, 94–95, 86 S.E. 852, 854–55 (1915). In time, the concept was expanded so that it could be invoked by a person of "ordinary firmness" (the objective standard) for a broader range of threats. Most states now recognize that duress may be asserted in appropriate situations by persons who in fact act under threat (subjective test). The modern or subjective test would seem to be the appropriate standard since it is after all the weak natured person who requires the law's protection. *See Restatement (Second) of the Law of Contracts*, § 175, at 478 (1981); 13 W. Jaeger, *Williston On Contracts*, § 1605, at 668–71 (3d ed.1970).

While the Virginia Supreme Court has never specifically adopted the subjective test, it is arguable that this was the standard applied in one of its most recent cases on duress. *Compare Jacobs v. Jacobs*, 218 Va. 264, 237 S.E.2d 124 (1977) with 13 W. Jaeger, *Williston On Contracts*, § 1605, at 670–71 (3d ed.1970); *Restatement (Second) of the Law of Contracts*, § 175 comment c at 478 (1981); and *Ford v. Engleman*, 118 Va. 89, 96, 86 S.E. 852, 856 (1915). Also, the following statement from *Michie's Jurisprudence* which suggests a subjective standard was recently quoted with approval by the Virginia Court of Appeals:

> Duress may exist whether or not the threat is sufficient to overcome the mind of a man of ordinary courage, it being sufficient to constitute duress that one party to the transaction is prevented from exercising his free will by reason of threats made by the other and that the contract is obtained by reason of such fact. Unless these elements are present, however, duress does not exist.

6B *Michie's Jurisprudence, Duress and Undue Influence* § 3, at 115 (Repl.Vol. 1985) (quoted in *Norfolk Division of Social Services v. Unknown Father*, 2 Va.App. 420, 434–35, 345 S.E.2d 533, 541 (1986)).

Blanton presents an issue of economic duress, and in this area most of the cases demonstrate that the nature of the victim's firmness or courage has little bearing on the outcome.[8] The modern law of economic duress represents the recognition by courts that the law should play a role

> in correcting inequitable or unequal exchanges between parties of disproportionate bargaining power and a greater willingness to not enforce agreements which were entered into under coercive circumstances.

*Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Service Co.*, 584 P.2d 15, 21, 9 A.L.R. 4th 928, 935 (Alaska 1978).

As the *Alyeska* case (which contains an excellent summary) and other authorities demonstrate, the basic elements of an economic duress claim are (1) the party re-

---

**7.** As discussed below, the abstract general principles of duress law require each case to be decided on its own facts. Consequently there seems to be no great diversity of duress law among the states, and court decisions often cite duress holdings of other jurisdictions.

**8.** However, see the comments of Professor Dalzell in *Duress By Economic Pressure II*, 20 N.C.L. Rev. 341, at 379–82.

ceived a wrongful or unlawful threat which (2) under the circumstances permitted the party no reasonable alternative or adequate remedy (deprived the party of a free will to act) and (3) thus caused the party to involuntarily accept the terms offered. *Ismert and Assoc. Inc. v. New England Mutual Life Ins. Co.*, 801 F.2d 536, 548–49 (1st Cir.1986); *Johnson, Drake & Piper, Inc. v. U.S.*, 531 F.2d 1037, 209 Ct.Cl. 313 (1976); *Freedlander, Inc. The Mortgage People v. NCNB Nat'l Bank of N.C.*, 706 F.Supp. 1211 (E.D.Va.1988); *Totem Marine Tug & Barge, Inc.*, 584 P.2d at 21–3, 9 A.L.R. 4th at 935–37; *Capps v. Georgia Pacific Corp.*, 253 Or. 248, 253–54, 453 P.2d 935, 938–39 (1969); Annotation, *Doctrine of Business Compulsion*, 79 A.L.R. 655 (1932).

The Virginia common law of economic duress does not appear to differ appreciably from that in other jurisdictions. Although the Virginia cases have generally contained language emphasizing a restrictive and conservative view of the law, the results of the cases reported in recent years do not seem to remove Virginia from the mainstream. *Jacobs*, 218 Va. at 264, 237 S.E.2d at 124; *Bond v. Crawford*, 193 Va. 437, 69 S.E.2d 470 (1952); *Vick v. Siegel*, 191 Va. 731, 62 S.E.2d 899 (1951); *Seward v. Amer. Hardware Co., Inc.*, 161 Va. 610, 171 S.E. 650 (1933); *Gloth v. Gloth*, 154 Va. 511, 153 S.E. 879 (1930); *Cary v. Harris*, 120 Va. 352, 91 S.E. 166 (1917); *Harris v. Cary*, 112 Va. 362, 71 S.E. 551 (1911); *cf. Thomas & Cross v. Brown*, 116 Va. 233, 81 S.E. 56 (1914).

Most cases of economic duress have involved attempts of victims to avoid agreements allegedly made under duress. Here, Blanton seeks to recover money he agreed to pay Prudential–Bache, a right recognized in duress circumstances by a number of courts. *See Vick v. Siegel*, 191 Va. at 731, 62 S.E.2d at 899 (recovery allowed of improper commission paid under duress); 25 *Am.Jur.2d, Duress and Undue Influence*, §§ 6, 24 (1966); 66 *Am.Jur.2d, Resti-*

*tution and Implied Contracts*, § 14 (1973).

To state the obvious, the opportunity for variety in coerced transactions is limited only by human imagination. The numerous cases involving issues of economic duress have produced many statements of general principle but no simplified or mechanical formula for arriving at results.[9] It is therefore necessary to consider each case on its own facts. 6B *Michie's Jurisprudence, Duress and Undue Influence*, § 3, at 116; *Capps*, 253 Or. at 253–54, 453 P.2d at 938–39.

■ In this case, the Court must determine whether Blanton has established (1) that Trice's threats to sue Blanton and terminate his employment were unlawful or wrongful and in addition (2) that Blanton complied with the threats by consenting to the payment because he had no reasonably acceptable alternative or adequate remedy.

### The Threats.

It need not be shown that Trice acted unlawfully. For Blanton's purposes it will be sufficient if the threats were morally wrong or in bad faith. Bad faith may take many forms, including the threatening party's wrongful use of its predominate position over the other party. *See* 13 W. Jaeger, *Williston On Contracts*, § 1608, at 682 (3d ed. 1970).

Courts often cite the general rule that, absent bad faith, it is not duress to threaten what one has a right to do; this has been held to include both threats of litigation and the termination of employment. 25 *Am.Jur.2d, Duress and Undue Influence*, § 18, at 375–77 (1966); *Restatement (Second) of the Law of Contracts*, § 176 (1981); *Bond v. Crawford*, 193 Va. at 437, 69 S.E.2d at 470; *Bachorik v. Allied Control Co., Inc.*, 34 A.D.2d 940, 312 N.Y.S.2d 272 (N.Y.App.Div.1970).

*Threat To Sue Blanton.* At the time the threats were made, it was not known precisely what Blanton's losses might be. However, in the instant litigation, Blan-

---

**9.** For comprehensive studies of the subject, see Wertheimer, *Coercion* at 19–53 (Princeton University Press, 1987); Dawson, *Economic Duress—* *An Essay In Perspective,* 45 Mich.L.Rev. 253 (1947); Dalzell, *Duress By Economic Pressure Parts I and II,* 20 N.C.L.Rev. 237, 341 (1942).

ton's indebtedness to Prudential–Bache for the liquidation losses in his command account is undisputed. No evidence has established the losses were caused by Prudential–Bache, nor has any evidence suggested it would have been wrongful for the company to sue Blanton for these losses.

*Threat To Terminate Blanton's Employment.* As an officer of Prudential–Bache and as Blanton's regional manager, Trice was in a position to have Blanton fired, and as a matter of contract the company could have legally fired him. Blanton was a professional who daily dealt with other investment professionals, including persons in management positions at Prudential–Bache. Although subordinate to Trice, he was at a level of employment not greatly different from Trice, and the evidence has not shown Trice took an unfair or bad faith advantage in this threat.

The Court has considered and found unpersuasive as to Blanton those cases upholding duress claims of employees who were coerced by employers into accepting unfavorable settlements of injury claims. *See Mitchell v. CC Sanitation Co. Inc.*, 430 S.W.2d 933 (Tex.Civ.App.1968); Annotation, *What Constitutes Duress by Employer or Former Employer Vitiating Employee's Release of Employer from Claims Arising Out of Employment*, 30 A.L.R. 4th 294 (1984); *Restatement (Second) of the Law of Contracts*, § 176 Comment e at 486–87; 489 (1981). The distinction is that in these types of cases, employees were usually persuaded to accept grossly unfair settlements; Blanton was persuaded to pay an indebtedness which he does not dispute.

In conclusion on the threats question, there is no evidence that Trice was not prepared to do as he said. As to each threat, he was insisting that Prudential–Bache would resort to its legal rights unless Blanton covered his losses, and the rights asserted were not unreasonable under the circumstances. Evidence of abusive conduct alone is not enough to make Trice's threats wrongful. *See Spillers v. Five Points Guaranty Bank*, 335 So.2d 851 (Fla.Dist.Ct.App.1976). Accordingly,

the Court concludes that Trice's threats were not in bad faith and do not support Blanton's claim of duress. *See Landers v. New York*, 56 A.D.2d 105, 391 N.Y.S.2d 723 (N.Y.App.Div.1977); *Bachorik v. Allied Control Co., Inc.*, 34 A.D.2d 940, 312 N.Y. S.2d 272 (N.Y.App.Div.1970); Dalzell, *Duress By Economic Pressure II*, 20 N.C.L. Rev. 341, 366 (1942).

Moreover, since the evidence does not establish that the difficulty of Blanton's situation was caused by Prudential–Bache, his acceding to Trice's demands to reimburse the company for losses in the command account were not payments made under duress. *See Johnson, Drake & Piper, Inc.*, 531 F.2d at 1042–43, 209 Ct.Cl. at 315; *Ryder Truck Lines, Inc. v. Goren Equip. Co. Inc.*, 576 F.Supp. 1348, 1355 (N.D.Ga.1983).

### Alternative Remedy.

Although the Court's finding of no wrongful conduct by Prudential–Bache disposes of the duress claim, the Court will nevertheless consider whether Blanton had an alternative adequate remedy. To put the issue in the perspective of the older cases, did Trice's conduct deprive Blanton of a free will to act?

As in other areas of duress law, general principles give the Court only a loose guide. For example:

> Before the coercive effect of the threatened action can be inferred, there must be evidence of some probable consequences of it to person or property for which the remedy afforded by the courts is inadequate.

*Hartsville Oil Mill v. U.S.*, 271 U.S. 43, 49, 46 S.Ct. 389, 70 L.Ed. 822 (1926); *see also,* 13 W. Jaeger, *Williston On Contracts* (3d ed.1970) § 1617, at 704, 705 n. 11; Dalzell, *Duress By Economic Pressure II*, 20 N.C. L.Rev. 341, 367–70 (1942).

On January 28, 1987, Blanton had a choice, so far as he knew, of agreeing to pay his margin or being sued and fired from employment. In these alternatives he was not confronted with choices leading to imminent financial disaster. By refusing the demand of payment, Blanton might have later been subject to a law suit in

which a court would determine any obligation he had to Prudential–Bache. If he had been immediately discharged, any rights arising out of the termination would have been preserved. Moreover, as an educated and accomplished professional, his opportunities for other employment should have been good.

Blanton's circumstances are not comparable to those in cases holding a claimant had no acceptable alternative to a coerced payment. For example, in the following cases claims for repayment were allowed:

(1) Seller of real property was required to pay improper commission for trustee's release of deed of trust from realty. *Vick v. Siegel,* 191 Va. 731, 62 S.E.2d 899 (1951).

(2) Department store was required to pay improper storage fees to obtain release during wintertime of customers' fur coats. *S.P. Dunham & Co. v. Kudra,* 44 N.J.Super. 565, 131 A.2d 306 (Ct.App.Div.1957).

(3) Payments were made to avoid wrongful termination of oil lease. *Western Gulf Oil Co. v. Title Ins. & Trust Co.,* 92 Cal.App.2d 257, 206 P.2d 643 (1949).

(4) Tenant paid portion of price from sale of business wrongfully demanded by landlord as condition to landlord's approval of sale to new tenant. *Hochman v. Zigler's Inc.,* 139 N.J.Eq. 139, 50 A.2d 97 (N.J.Ch.1946).

(5) Kickback payments were required by employer as condition of employee's employment. *Caivano v. Brill,* 171 Misc. 298, 11 N.Y.S.2d 498 (N.Y.Civ.Ct.1939).

Blanton's free will to act was not deprived by physical pressure from Trice. Blanton had an alternative adequate remedy to Trice's demands; therefore his payment was not made under duress and cannot be recovered under this Count. *Compare Wessel, Duval & Co. v. Winborne & Co., Inc.,* 125 Va. 502, 510, 99 S.E. 719, 721 (1919).

*Count II $1,350,000.00 Preference*

*Count III $1,605,440.00 Preference*

In these Counts, Blanton seeks to have the payments he made to Prudential–Bache upon the two withdrawals from his deferred compensation account avoided and returned to his bankruptcy estate as preferential transfers under § 547(b).

Section 547(b) of the Bankruptcy Code provides for the trustee or debtor in possession to avoid and recover a transfer of an interest of the debtor in property:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (1982).

Section 547 and other Code provisions contain exceptions and limitations on the authority to avoid a preferential transfer. The most serious obstacle to Blanton's preference claims is found in § 546(e) of the Code which provides that notwithstanding § 547, the trustee may not avoid a transfer that is a margin payment or settlement payment made before commencement of the bankruptcy case to a stockbroker or similar financial institution. 11 U.S.C. § 546(e).[10]

---

**10.** This limitation on the avoiding power does not apply to fraudulent transfers described in § 548(a)(1). The definitions of margin payment and settlement payment prescribed by § 546(e) are as follows:

Blanton has the burden of proof on the preferential transfer claim under § 547. Prudential–Bache has the burden to show the transfer is excepted under § 546(e).

Aside from testimony, the evidence of the transactions in question is contained in two basic types of documents from the records of Prudential–Bache. One document is a computerized summary from the company records called an "Action Advisory"; this form reveals the status of an investor's account at a particular moment, including the amount of any margin call. The information in the action advisory is produced on a computer screen for convenience of the branch office and is not necessarily copied as a daily record. The other important documentary evidence is Prudential–Bache's monthly statements of Blanton's margin or command account. Available here for the months December 1986 through March 1987, these statements appear to reflect all command account transactions.

Blanton and other witnesses at trial gave testimony concerning computer record keeping problems experienced by Prudential–Bache in January 1987. However, the testimony was nonspecific as to any documentation in evidence and does not provide a basis for the Court to disregard the documentary evidence.

As explained by Blanton at trial, the investments in Swiss franc option contracts involved his sale of calls and puts for which he received a premium. ·The purchaser in the transaction received a contractual right during a fixed period of time to purchase francs from Blanton (call) or sell francs to Blanton (put), all at a fixed price. In order for Blanton to get out or liquidate the contracts prior to maturity it was necessary that these calls and puts be bought back. Therefore, the liquidation of the option positions required the expenditure of funds.[11]

Blanton's trading in these positions had been financed by Prudential–Bache through his command account. The two payments in issue, which have been discussed at length in this opinion, were made by Blanton to Prudential–Bache for deposit to this account in the face of the U.S. dollar declining against the Swiss franc.

Prudential–Bache Argument that the Payments Were Margin Or Settlement Payments Excepted from § 547 by § 546(e).

A finding by the Court that the § 546(e) exception applies to the payments would preclude the necessity to further consider whether the payments were preferential transfers under § 547. And since this in fact is what the Court has concluded, § 546(e) will be considered first.

Blanton argues that Prudential–Bache has not proven the two payments were margin payments under § 546(e). However, except for general statements concerning Prudential–Bache's computer record problems, he does not assert that Prudential–Bache's margin call figures in evidence were incorrect. As to the first

"margin payment" means payment or deposit of cash, a security, or other property, that is commonly known to the securities trade as original margin, initial margin, maintenance margin, or variation margin, or as a mark-to-market payment, or that secures an obligation of a participant in a securities clearing agency;
11 U.S.C. § 741(5) (1982).
"margin payment" means payment or deposit of cash, a security, or other property, that is commonly known to the commodities trade as original margin, initial margin, maintenance margin, or variation margin, including mark-to-market payments, settlement payments, variation payments, daily settlement payments, and final settlement payments made as adjustments to settlement prices;
11 U.S.C. § 761(15) (1982).

"settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade;
11 U.S.C. § 741(8) (Supp.IV 1987).

**11.** This distinguishes the instant situation from that with the usual margin account in which the broker finances an investor's purchase of stock. In a liquidation, the stock is simply sold by the broker with proceeds applied to the investor's margin account. For NYSE definitions of call and put, see Rule 700(b)(8) and (46) of the Rules of Board, New York Stock Exchange. 2 *CCH New York Stock Exchange Guide,* ¶ 2700, at 4526, 4530.

payment of $1,350,000.00 on January 27, 1987, his position is that the amount of margin call has not been established for the date of payment. As to the payment of $1,436,868.98 transferred by Prudential–Bache to the command account on February 6, 1987, Blanton argues that because of a delay by Prudential–Bache in correctly entering this payment on its books until April 1987, the nature of the payment should be determined as of this later time.

It is true that in some respects the evidence on margin calls could have been more enlightening. For example, there is testimony that the margin requirements applicable to Blanton's franc options are set by the New York Stock Exchange but no showing of what the initial or maintenance margin requirements are for calls and puts of foreign currency or how the margin figures reflected in Prudential–Bache's exhibits were calculated.[12] The evidence concerning the "volatile" market conditions which caused the crisis has not been specific. However, since there is no evidence of the initial amounts of Blanton's investments in the options or how much Prudential–Bache financed on margin, and since the burden is on Blanton in the first instance to prove that the payments were for antecedent debts under § 547(b)(2), it is difficult not to conclude that the payments in question were in fact margin payments.

*$1,350,000.00 Payment of January 27, 1987.* Blanton testified that his $1,350,000.00 payment to Prudential–Bache on Tuesday, January 27, was for the purpose of meeting margin calls issued the preceding week. There is no evidence of the amount of his call at the close of business on January 26. However, his call at close on Friday, January 23, was in the amount of $958,869.00; at closing on January 27, *after* the payment of $1,350,000.00, there remained outstanding a call of $440,583.00. No transaction reflected in the command account during this interval casts doubt on the continuous existence of a substantial margin call.

Since there remained a call against Blanton on the same day after the payment was made, it must be concluded that the payment was applied by Prudential–Bache to reduce the call out on January 27, 1987. Blanton intended the payment for this purpose, and it is not necessary under these circumstances for the company to establish the precise amount of margin call at the moment payment was received. Therefore, pursuant to § 546(e), the $1,350,000.00 payment cannot be avoided as a preferential transfer under § 547.

*$1,436,868.98 Payment of February 6, 1987.* Although the evidence shows that both Trice and Blanton intended the payment authorized by Blanton's memorandum of January 28, 1987, to be applied to Blanton's outstanding margin calls, the circumstances surrounding this payment are considerably more complicated than for the first payment. The evidence reveals that in response to Blanton's directive, the sum of $1,436,868.98 was wire transferred by Prudential–Bache to his command account on February 6.

One problem with the February 6 payment, and on which it appears Blanton's whole position as to this payment rests, arises from Prudential–Bache's treatment of the transaction on its books. Rather than enter the payment as a withdrawal from Blanton's deferred compensation account as Trice and Blanton contemplated, apparently the only book entry relating to the transaction on February 6 reflected a $1,436,868.98 salary advance to Blanton. This accounting treatment, which was not satisfactorily explained in the trial record, appears to have been erroneous. Several weeks later, in April, appropriate new entries were made in the company books reflecting the withdrawal of $1,605,440.21 from Blanton's deferred compensation account and the withholding of Federal and state income taxes for Blanton.

Blanton's position on the $1,605,440.21 preference count seeks to take advantage of Prudential–Bache's bookkeeping treat-

---

**12.** The NYSE margin requirements for calls and puts of foreign currency are in Rule 431(f)(2), of the Rules of Board, New York Stock Exchange, 2 *CCH New York Stock Exchange Guide*, ¶ 2431, at 3757–2 through 3757–3.

ment of the transaction. His counsel asserts that the formal withdrawal on the company books of funds from deferred compensation in April 1987 effectively repaid the company an antecedent debt of Blanton, the incorrectly entered salary advance of February 6. So regarded, it is argued, the payment would not have been a margin payment.

This contention that Prudential–Bache in effect paid itself a preference for Blanton in April 1987 cannot be sustained. There is no rational basis for allowing Blanton to take advantage of the company's internal clerical treatment, whether or not it was an oversight. It is apparent that upon receipt of Blanton's memorandum of January 28 by Prudential–Bache in New York, calculations were made for a gross withdrawal of $1,605,440.21 from deferred earnings, reduced by 8.5 percent Federal tax and 2 percent state tax, and the net of $1,436,868.98 was paid to Blanton's command account on February 6. The substance of the entire transaction is that Prudential–Bache advanced funds to Blanton which were intended by the parties to be a withdrawal from deferred compensation.

The issue remains whether the deposit of these funds in Blanton's command account resulted in a preferential transfer or was an excepted margin or settlement payment.

In substance Prudential–Bache argues that any payment by Blanton which was used to reduce a deficiency in his margin account constituted either a margin or settlement payment for purposes of the exception under § 546(e). Certainly the evidence here gives general credence to the company's argument. In the face of the falling market, what else could the payments be?

The position that the February 6 wire transfer was a margin or settlement payment must rest upon evidence of the amount of Blanton's margin calls as revealed in Prudential–Bache's action advisories, along with the transactions in Blanton's command account. This account, which posts the daily receipt and disburse-

ment of funds with the net cash positions, reveals that from January 28 through February 10, Blanton's investments were being liquidated and that substantial expenditures were being made almost daily to buy back his franc options.

Blanton's margin call on February 3 (the last date for which an action advisory is available) was $1,317,711.00. The command account reflects no February transactions until February 6. On this date, as a result of the receipt of the $1,436,898.98 payment, the sale of treasury bills in the account, and expenditures for the purchase of franc options, Blanton's account was left with a cash surplus in the amount of $862,625.51. Liquidation expenditures to purchase calls and puts on February 9 and February 10 left Blanton a deficit in his account of $700,116.16 on February 10. This was the date on which the last of Blanton's franc straddle positions was liquidated.

Blanton's command account further reveals in summary that from January 28, the date he authorized the payment of February 6, until February 10 when the last franc positions were eliminated, Prudential–Bache incurred total expenditures in the market for buying option positions of $8,203,681.00 and received $3,225,639.00 from sale or other liquidation of Blanton's investments, a net deficit of $4,978,042.00. In essence, it was to this deficit that Blanton's payment of $1,436,898.98 was applied. When by March 25, 1987, all of Blanton's investments had been liquidated, the amount of the deficit in the command account was reduced to $532,686.33. This sum is included in the total command account deficit of $1,033,100.00 to which the parties have stipulated.[13]

The terms margin call and settlement payment are very broadly defined by the Bankruptcy Code. The evidence here leads the Court to the inescapable conclusion that Blanton's payment of February 6 must be treated as a margin or settlement payment which under § 546(e) is excepted

---

13. The later deficit increase resulted from cash advanced by Prudential–Bache as additional tax withholding for Blanton.

from treatment as a preferential transfer under § 547(b). Even ignoring evidence of the February 3 margin call, the payment may be considered to have been used to defray settlement of Prudential–Bache's market expenditures in Blanton's behalf from January 28 through February 10.

The Court's determination that the § 546(e) exception applies to both the $1,350,000.00 payment of January 27 and the $1,436,898.98 payment of February 6 renders moot any further consideration under § 547 of Counts II and III of Blanton's complaint.

### Count IV Breach of Contract

### Count VIII Breach of Fiduciary Duty

In Count IV of his amended complaint, Blanton alleges that Prudential–Bache breached the terms of the deferred compensation plans by failing to withhold "applicable federal and state income taxes from" his withdrawals of $2,000,000.00 and $1,605,400.00.[14] On brief, Blanton's counsel combines Count IV with Count VIII of the amended complaint, alleging Blanton was damaged as a result of Prudential–Bache's breach of a fiduciary duty to him. In fact, as pointed out previously in this opinion, it is only with respect to Count IV that Blanton continues to press the allegations of breach of fiduciary duty.

It is the substance of Blanton's position that the requirements of Internal Revenue law and the deferred compensation plans for the withholding of taxes created a fiduciary relationship between Prudential–Bache and Blanton with Blanton as beneficiary. Under this trust relationship Prudential–Bache had a duty not only to use the funds withheld for the purpose intended but additionally to protect Blanton's interest in a broader sense. As a prime example, Blanton's counsel argues that Prudential–Bache had a duty to advise Blanton of the consequences of underwithholding tax so that Blanton could properly provide for the proper amount of withholding.

The pertinent facts found by the Court on the withholding tax question are that Blanton had filed with Prudential–Bache an IRS Form W–4, withholding allowance certificate, dated September 26, 1985, requesting the withholding of 20 percent in Federal taxes from his wages; this W–4 was in effect until March 17, 1987, when he filed a revised W–4 form requesting the withholding of 40 percent Federal and 6 percent state tax. Notwithstanding the 20 percent W–4 withholding instruction in effect in January 1987, Blanton requested informally through his branch manager that just 8.5 percent be withheld from the $2,000,-000.00 withdrawal. Prudential–Bache complied with this request and also withheld 8.5 percent from the second payment although Blanton had given no withholding directions at that time. The initial amounts withheld at 8.5 percent were $170,000.00 and $136,462.43, respectively; subsequently, Prudential–Bache increased the taxes on the withdrawals by $328,371.44, Federal, and $163,485.80, state. The total increase of $491,857.24 was treated by the parties as a loan to Blanton; with this increase, Federal withholding taxes for Blanton were remitted to IRS in the amount of $634,-833.87, which was equal to 17.6 percent of the two withdrawals.

Blanton argues that Prudential–Bache's initial withholding from the two withdrawals of 8.5 percent was in violation of the W–4 instructions which required 20 percent withholding in January 1987 and 40 percent in April 1987; the subsequent increase paid by Prudential–Bache remains insufficient. Consistent with Blanton's argument under the preference count, his counsel asserts that because the second withdrawal of $1,605,440.21 was not correctly entered on Prudential–Bache's books until April 1987, the revised W–4 of March 27 which required 40 percent Federal tax withholding was applicable to that withdrawal.

Prudential–Bache's counsel argues that since Blanton controlled the $2,000,000.00 withdrawal, receiving the net funds and apparently applying them as he saw fit, he is not in a position to claim that more

14. The actual amount of the second withdrawal was $1,605,440.21.

should have been withheld. Blanton, it is urged, could have used the funds to pay additional income tax.

Internal Revenue Code § 3402, 26 U.S.C. § 3402 (1982 & Supp. IV 1987), requires an employer to withhold Federal income taxes from an employee in accordance with an exemption allowance certificate (Form W–4) filed by the employee with the employer. Section 3402(f)(4) provides that an employee's Form W–4 remains in effect until replaced by another certificate.

It is the Court's opinion that "applicable" withholding taxes as used in the deferred compensation plan would ordinarily mean those taxes an employer is required to withhold by the Internal Revenue Code and Treasury Regulations.

While Blanton's request to reduce the withholding on the $2,000,000.00 withdrawal may tend to undercut his position on the payment, it does not excuse Prudential–Bache's failure to comply with tax law and the company's own policy of withholding based upon an employee's W–4 certificate. The Court concludes that Blanton is correct in his assertion that Prudential–Bache should have withheld 20 percent from the first withdrawal regardless of Blanton's informal approval of 8.5 percent. 26 U.S.C. § 3402(f)(4) (1982).

It is the tax withholding from Blanton's second withdrawal and payment to Prudential–Bache of $1,605,440.21 that is most troubling to the Court. As has been found, the company through Mr. Trice rather forcefully required Blanton to make this payment as a condition of his continued employment. Although the Court has previously held there was no duress in this, the relationship between the company and its employee raises a new and unrelated issue which requires a close look at how Prudential–Bache handled the transaction once Blanton authorized the payment.

It must be remembered that Blanton had been one of Prudential–Bache's leading producers and had accumulated substantial earnings for which income tax would be due only upon his withdrawal of the funds.

Now he was faced with a major financial crisis which had required him within a two week period to draw down over three and a half million dollars in taxable income. For 1987, the maximum Federal income tax rate was 38.5 percent,[15] and Prudential–Bache should have been well aware that Blanton's income tax liability for the year was not likely to be covered by 20 percent withholding, much less 8.5 percent or 17.6 percent.

Constructive trusts are created in equity to prevent fraud or injustice, including unjust enrichment; where applicable, the doctrine is usually applied by a court to find that property held by one party is impressed with a trust for the benefit of another. 19 *Michie's Jurisprudence, Trusts and Trustees,* §§ 48, 50 (1979); 76 *Am.Jur.2d, Trusts,* § 221–22 (1975); 89 *C.J.S., Trusts,* § 139 (1955).

Constructive trusts often arise from the existence and abuse of a fiduciary relationship. In Prudential–Bache's obligation to withhold taxes from Blanton's draw of deferred earnings, the company may be considered an agent to its employee for the limited purpose of properly dispersing the funds. An agent, of course, acts as fiduciary with respect to matters within the agency.

> It is well settled that an agent is a fiduciary with respect to the matters within the scope of his agency. The very relation implies that the principal has reposed some trust or confidence in the agent. Therefore, the agent or employee is bound to the exercise of the utmost good faith and loyalty toward his principal or employer. He is duty bound not to act adversely to the interest of his employer by serving or acquiring any private interest of his own in antagonism or opposition thereto.... This is a rule of common sense and honesty as well as of law.

*Byars v. Stone,* 186 Va. 518, 530, 42 S.E.2d 847, 852–53 (1947) (citations omitted); *see also* 1A *Michie's Jurisprudence, Agency,*

---

**15.** The maximum rate for a married individual filing a separate return was 38.5 percent on all income in excess of $45,000.00. 26 U.S.C. § 1(h)(2)(D) (Supp.IV 1987).

§§ 2, 4, 12 (1980); 2A *C.J.S. Agency*, § 57 (1972).

A fiduciary relationship may exist in the absence of the usual formal positions of principal-agent, attorney-client, etc. The conditions which give rise to a fiduciary relationship have been described in many ways. For example, where as between two parties to a transfer there is a personal relationship of such a character that the transferor is justified in believing the transferee will act in the transferor's interest, the transferee may be a fiduciary. 1 Fratcher, *Scott On Trusts* § 44.2, at 458 (4th ed.1987). Also, a fiduciary relationship will exist where trust and confidence are reposed by one person in another, and there is a resulting superiority and influence in the other party. 89 *C.J.S., Trusts.* § 151, at 1055 (1955); *cf. In re Nova Real Estate Investment Trust*, 23 B.R. 62, 66–67 (Bankr.E.D.Va.1982).

The law of constructive trusts and fiduciary relationship will prevent a profiting by a party who holds an inconsistent or conflicting position as to an interest in property. *See Byars v. Stone*, 186 Va. at 530, 42 S.E.2d at 852–53; *Broaddus v. Broaddus*, 144 Va. 727, 744, 130 S.E. 794, 799 (1925).

The determination of whether a fiduciary relationship exists and has been abused and whether an interest in property should be impressed with a constructive trust requires analysis of the facts of each case.[16] And as with other issues in this case there is no significant difference in the law to be applied here as between New York and Virginia. If anything, the New York law may be even more liberal than that of Virginia in imposing a trust to prevent an injustice. *See Latham v. Father Divine*, 299 N.Y. 22, 27, 85 N.E.2d 168, 170, 11 A.L.R.2d 802 (1949).

The Court finds that when Prudential–Bache on January 28, 1987, required Blanton to make the payment or be fired, it also assumed a duty beyond merely maximizing the amount it would receive toward the

accumulating losses of its employee. The company was in an "inconsistent" position by its control and ability to withdraw the funds for Blanton and allocate the payment as between itself and tax withholding for Blanton. Therefore, a fiduciary relationship arose between the parties, and as a result Prudential–Bache had a clear duty to make the proper application of Blanton's funds and not to unjustly enrich itself at his expense. The Court's conclusions are founded on clear and convincing evidence which is the applicable standard of proof.

■ In view of Blanton's required realization of substantial income it would have been fair and equitable for Prudential–Bache to withhold sufficient income tax for Blanton to be able to pay his full Federal tax liability on the withdrawal, and the Court consequently finds that Prudential–Bache breached its fiduciary obligation to Blanton by its failure to do so.

Blanton's damage resulting from Prudential–Bache's failure is the difference between the amount the company has paid in Federal withholding taxes from the withdrawal and the 1987 maximum income tax rate of 38.5 percent (The Court has previously ruled that the withdrawal was effective on February 6, 1987; therefore, Blanton's 40 percent W–4 of March 17, 1987, is inapplicable.)

Based upon the Court's conclusions concerning the proper income tax withholding from the two 1987 withdrawals, it is held that Prudential–Bache must remit to the IRS the sum of $383,260.21 in additional 1987 Federal income withholding tax for Blanton. This figure represents the difference between $1,018,094.48, the total withholding required (20 percent of $2,000,-000.00; 38.5 percent of $1,605,440.21) and $634,833.87, the amount previously paid.

Since the additional tax payment is actually an adjustment of Prudential–Bache's previous application of Blanton's payments, the company may increase Blanton's indebtedness to it in the same amount it must remit as additional tax for 1987.

---

16. The Court has been able to find few cases raising the issue of fiduciary relationship between employer and employee and no case having facts similar to those confronted in this case. *See* Bogert, *Trusts & Trustees*, § 481, at 272 n 38 (1978 & Supp.1988); Annotation, *Relationship of Employer and Employee Between Parties to Contract Not Relating to Employment Itself, as Creating Presumption of Fraud*, 100 A.L.R. 675 (1936).

In addition to an increase in withholding taxes Blanton on brief asks the Court to allow his bankruptcy estate prejudgment interest at 8 percent under Va.Code Ann. § 6.1–330.54 (1988) plus all penalties and interest that the estate will be required to pay to the IRS. The cited Virginia Code section which makes provision for 8 percent interest on Virginia judgments is inapplicable here since the comparable Federal judgment interest statute must apply. *See* 28 U.S.C. § 1961(a) (1982). No authority has been cited to support an award for prejudgment interest, and the request is denied. The Court also rejects the contention that Prudential–Bache should pay all tax penalties and interest that Blanton may owe. Prudential–Bache, as employer, may have to pay penalty and interest on its additional tax payment. However, even though there might be some justice in requiring Prudential–Bache to pay a portion of Blanton's 1987 tax penalties and interest, the evidence in this case is insufficient for the Court to determine Prudential–Bache's proper share of such a speculative liability.

The final question to be considered by the Court concerns Prudential–Bache's obligation to withhold and pay Federal and state income taxes for Blanton upon the company's setoff of $1,221,182.76 which is the total remaining balance in Blanton's deferred compensation and bonus accounts. As discussed previously, the setoff of these accounts against Blanton's indebtedness to the company will be a distribution of taxable compensation to Blanton which requires Prudential–Bache to withhold "applicable" income taxes.

Blanton notified Prudential–Bache of his resignation as an employee by letter dated July 16, 1987. At that time he had on file with the company the W–4 withholding allowance certificate dated March 17, 1987, providing for his employer to withhold 40 percent Federal and 6 percent state tax. ■ Prudential–Bache has not taken a position on brief concerning tax withholding from the setoff. However, there is no evidence before the Court that suggests any amount to be withheld other than Blanton's most recent W–4. Therefore, the Court finds that when Prudential–Bache exercises its right of setoff it must withhold and pay in Blanton's behalf 40 percent Federal income tax and 6 percent state tax from the funds remaining in Blanton's accounts.

It should be made clear that the Court's ruling on the tax withholding payments is not a determination of the amount of either Blanton's or Prudential–Bache's tax liability as such. The deferred compensation agreements required the company to withhold applicable taxes which the Court has found under ordinary circumstances to be in accordance with the employee's current Form W–4. In addition, the Court has found that extraordinary circumstances require Prudential–Bache to pay additional withholding tax for the withdrawal made on February 6, 1987. The Court's ruling is simply that these payments are required as between Blanton and Prudential–Bache, for the reasons stated in this opinion.

Moreover, in conformity with the Court's previous discussion of setoff issues, the taxes to be withheld under the Court's ruling, being trust fund taxes, are not subject to setoff by Prudential–Bache.

An appropriate order shall issue.

## JUDGMENT ORDER

In accordance with the Court's Opinion entered this day, it is ORDERED

As to Count I, Turnover, judgment is rendered for the Defendant.

As to Count II, Preference of $1,350,-000.00, judgment is rendered for the Defendant.

As to Count III, Preference of $1,605,-440.00, judgment is rendered for the Defendant.

As to Count IV, Breach of Contract, and Count VIII, Breach of Fiduciary Duty, judgment is rendered for the Plaintiff. It is ORDERED that the Defendant Prudential–Bache shall remit to the United States Internal Revenue Service the sum of $383,-260.21 as additional 1987 Federal income withholding taxes on behalf of Plaintiff.

As to Count V, Duress, judgment is rendered for the Defendant.

IT IS FURTHER ORDERED that Defendant Prudential–Bache is granted relief

from the automatic stay imposed by 11 U.S.C. § 362 for the purpose of exercising its right of offset against funds of the Plaintiff under 11 U.S.C. § 553 unless within ten days from the entry of this Order, Plaintiff files with the Court an appropriate request to offer adequate protection. If Plaintiff timely files such a request then the automatic stay shall remain in effect pending further order of the Court.

IT IS FURTHER ORDERED that upon Prudential–Bache's exercise of its offset rights against funds which consist of previously deferred taxable income to Plaintiff, Prudential–Bache shall pay appropriate employment taxes on the amount of income realized by Plaintiff in the offset, including income withholding taxes in the amounts of 40 percent, Federal, and 6 percent, State of Virginia.

IT IS FURTHER ORDERED that the Defendant's renewed "motion to strike" that was made at the close of Defendant's case is denied.

IT IS FURTHER ORDERED that the CLerk shall send a copy of this order to counsel for the Plaintiff, counsel for the Defendant, and to the Office of the United States Trustee, Richmond Division.